# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4523-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

W.H.,

    Defendant-Appellant,

and

K.W., R.C., and M.L.,

    Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.W.,
K.C., and K.W.,
    minors.

_____

Submitted July 15, 2020 – Decided August 11, 2020

Before Judges Hoffman and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0013-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Anne E. Gowen, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Andrea Stickley, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor K.W. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant W.H. appeals from the judgment of guardianship dated May 31, 2019, terminating his parental rights to his daughter K.W. (Karen), born in 2011.[1] We affirm substantially for the reasons set forth by Judge Michael R. Ostrowski in his oral opinion issued the same date.

---

[1] We use initials and pseudonyms to protect the family's privacy. R. 1:38-3(d)(12). For ease of reference, we refer to W.H. as defendant.

A-4523-18T2

I

The relevant evidence was discussed in detail in Judge Ostrowski's opinion. We summarize the most significant facts here. Karen has special needs, emotional issues, learning disabilities, and a muscle disorder. She remained in the custody of her mother K.W. for six years. K.W. has two other children, Kelsey born in 2013 and Kevin born in 2016, who are Karen's half-siblings.[2] Karen's father is defendant, who was incarcerated from 1989 to 1994 and from 2012 to May 2017.

In August 2014, the Board of Social Services conducted a genetic test confirming defendant's paternity of Karen. In June 2017, the Division of Child Protection and Permanency (the Division) was granted custody of Karen and her half-siblings, after K.W. tested positive for numerous drugs, and placed them together with a foster mother. Attempting to reunify the children with K.W., the Division provided her with extensive services, including substance abuse treatment, counseling, and a psychological and bonding evaluation.

After K.W. failed to achieve sustained remission from her substance abuse problem or secure affordable housing for the family, the Division proposed a

---

[2] Kelsey and Kevin are not subjects of this litigation because their biological fathers, R.C. and M.L., along with K.W., all completed identified surrenders to the paternal aunt.

A-4523-18T2

new permanency plan, which included termination of the parental rights of the parents of all three children, to be followed by adoption by the foster mother. The court approved the plan, with an ongoing concurrent goal of reunification.

Meanwhile, the Division began searching for defendant in September 2017, upon learning of his release from prison. After months of attempted contact, defendant denied he was Karen's father, notwithstanding the 2014 genetic testing. The Division maintained sporadic contact with defendant thereafter.

Prior to the guardianship trial, K.W. presented her aunt as a potential placement for her children, when the foster mother declined to adopt all three of them. The Division acknowledged the aunt had been previously ruled out as a placement for the children based on her "husband's criminal history," but agreed to assess her again. The aunt confirmed her willingness to adopt all three children, consistent with the Division's plan.

At the surrender hearing, K.W. and Karen's half-siblings' fathers all completed identified surrenders in favor of Karen's aunt; however, defendant wanted to make an identified surrender to his brother, who wanted to adopt only Karen. In previous contacts with the Division, defendant mentioned his brother would be willing to adopt Karen but provided no contact information.

The Division explained its plan for all of the children to be placed with K.W.'s aunt because the "children had a relationship with [her] prior to being in placement [and] [t]he Division ha[d] started visitation[s] with her. She's had five supervised visits at the office with the mother and she's had two unsupervised visits with the children . . . ." Defendant's proposed surrender to his brother conflicted with the Division's plan.

At the time of the guardianship trial, defendant readily admitted he was not seeking custody of Karen and acknowledged he had only met her once in his life. He confirmed he was incarcerated from 1989 to 1994, and again between 2012 to 2017 for failure to register as a sex offender. At the time of trial, he was again incarcerated for failure to register.

In his oral opinion, Judge Ostrowski reviewed the trial testimony and evidence and determined the Division satisfied all four prongs of the best interests test[3] by clear and convincing evidence. The judge found the caseworker to be a credible witness, noting her testimony was appropriate and consistent with the record. In contrast, the judge found defendant to be "significantly lacking in credibility," and gave little weight to his testimony, noting he "couldn't keep his story straight."

---

[3] N.J.S.A. 30:4C-15.1(a).

A-4523-18T2

Under prong one, the judge found Karen did not have a parental relationship with defendant due to defendant's own actions and inactions. The judge found there was "not one shred of evidence that [defendant] did anything to involve himself in [Karen's] life other than some casual conversations with the Division . . . and one visitation through the Division." The judge found the Division met its burden under prong one, as Karen's health, safety, and development had been and would continue to be endangered by the parental relationship with defendant.

Addressing prong two, the judge found defendant made "precisely one effort, one step in the right direction" to eliminate the harm facing Karen, and that was the one visit. Defendant "wanted nothing to do with the Division, was unwilling to engage in Division services[, and] was unwilling to address any issues . . . ." The judge further found defendant avoided the Division "like the plague."

The judge found the caseworker provided defendant with the Division's contact information and attempted to reach out to him with the only information she had, which was a post office box. The judge further found defendant had "adequate notice of [a scheduled] psychological and bonding evaluation," but did not show. The judge found the Division met its burden under prong two that

6

defendant was unwilling and unable to eliminate the harm facing Karen. The judge also found defendant's transient lifestyle made "it extremely hard to provide a healthy, permanent, stable home for the child."

Under prong three, the judge found the Division made reasonable efforts to provide services to defendant; in contrast, defendant did not make any effort to involve his family until as late as January 2019 for them to be considered as a placement option for Karen. The judge noted that K.W. availed herself to the court, attended numerous hearings, and engaged in services to some extent. Based on the Division's willingness to provide K.W. with services, the judge found that if defendant had been amenable to services, they would have been provided to him. The judge found, through the caseworkers' efforts to stay in touch with defendant, that the Division made reasonable efforts to provide services to defendant, "with the little sparse information" it received from him. Defendant chose to make himself scarce and not take advantage of the services offered by the Division. The judge therefore concluded the Division had met its burden under prong three.

Addressing prong four, the judge found defendant "is a stranger" to Karen, noting "there is no relationship there." Thus, she would suffer irreparable harm "by continuing and for an indeterminate period of time" waiting for defendant,

"who refuses to engage with the Division." The judge took special note of the fact that defendant "clearly indicated that he was not seeking custody of [Karen]." The judge found the Division met its burden under prong four and that based on the totality of circumstances, termination of parental rights would not do more harm than good.

In reaching his conclusion, the judge stressed that his findings were not dependent on whether Karen's current placement was "ultimately the appropriate place for this child to end up." He noted that Karen's former resource home and the paternal relatives were also potential placements, and that "this may very well be subject to a hearing under a different docket and under a different setting where these issues do become relevant, not to the four prongs, but relevant to the permanency and best interest of the child in a context of permanency and placement."

Having concluded the Division established the four prongs of the best interests test by clear and convincing evidence, the judge entered the judgment of guardianship under review. This appeal followed. On appeal, defendant raises the following points of argument for our consideration:

I. THE COURT ALLOWED THE OTHER PARENTS TO SURRENDER TO THE MATERNAL AUNT AT PROCEEDINGS FROM WHICH THE DEFENDANT WAS EXCLUDED. FURTHER, DURING THE SURRENDERS,

THE STATE FAILED TO DISCLOSE TO THE COURT THAT THE MISSING DEFENDANT'S LITIGATION GOAL WAS INCONSISTENT WITH ADOPTION BY THE MATERNAL AUNT. THE SURRENDER PROCEEDINGS VIOLATED DUE PROCESS: [DEFENDANT] HAD A RIGHT TO BE HEARD PRIOR TO COURT ACTION THAT WOULD IMPERIL HIS ABILITY TO DEFEND HIS CASE.

A.    Due process required the court to give [defendant] an opportunity to be heard before it accepted the co-defendants' surrenders to the maternal aunt.

B.    Whether plain error, preserved error, or error resulting from ineffective assistance of counsel, the constitutional violation requires reversal.

1. Because the trial court was well aware of the legal risk inherent in proceeding without [defendant, he] should not be penalized for failing to perfectly preserve the due process argument.

2. Alternatively, to the extent [defendant's] attorney failed to adequately intervene on his client's behalf, his representation was constitutionally ineffective.

II.    A COURT MAY TERMINATE A PARENT'S RIGHTS ONLY IF THE STATE CLEARLY AND CONVINCINGLY PROVES THAT [THE DIVISION] MADE "REASONABLE EFFORTS" TOWARD REUNIFICATION AND ONLY IF THE COURT HAS CONSIDERED "ALTERNATIVES TO TERMINATION." WHERE [THE DIVISION] DELAYED IN NOTIFYING [DEFENDANT] THAT [KAREN] WAS IN FOSTER CARE, REFUSED TO LET HIM VISIT HER FOR MORE THAN EIGHT MONTHS, REFUSED TO EVALUATE HIS RELATIVES, AND FAILED TO DISCLOSE THEIR EXISTENCE TO THE COURT BEFORE

A-4523-18T2

THE OTHER PARENTS SURRENDERED, THE STATE FAILED TO MEET ITS BURDEN OF PROOF.

III. THE COURT VIOLATED THE MANDATE OF PRONG 4 WHEN IT OPTED TO DEFER TO A FUTURE PROCEEDING -- FROM WHICH [DEFENDANT] WOULD BE EXCLUDED -- ANY COMPARISON OF THE HARMS AND BENEFITS TO [KAREN] FROM (A) BEING ADOPTED BY THE MATERNAL AUNT (THE VIRTUALLY CERTAIN RESULT OF A TERMINATION JUDGMENT) AND (B) FOREGOING AN OPPORTUNITY TO LIVE WITH HER PATERNAL FAMILY (AS SHE COULD HAVE DONE, IF TERMINATION WERE DENIED).

IV. IF THIS COURT DOES NOT REVERSE THE GUARDIANSHIP JUDGMENT, [DEFENDANT] RESPECTFULLY MOVES FOR A REMAND SO HE CAN SEEK RELIEF FROM JUDGMENT IN THE TRIAL COURT. (NOT RAISED BELOW.)

II

Parents have a constitutionally protected right to enjoy a relationship with and to raise their children. N.J. Div. of Youth and Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "[T]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). However, a parent's rights are not absolute. Ibid. "Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of

10

serious physical or emotional harm or when necessary to protect the child's best interests." Id. at 553-54.

In order for the State to terminate parental rights, it must satisfy the following prongs of the "best interests of the child" test by clear and convincing evidence:

> 1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> 2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> 3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> 4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1a.]

The four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best

interests," with parental fitness being the critical issue.  In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).  The considerations involved are fact-sensitive and require particularized evidence that address the specific circumstances present in each case.  Ibid.

Our review of Judge Ostrowiski's decision is limited.  See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007).  We will not disturb a trial judge's factual findings so long as they are supported by substantial credible evidence.  R.G., 217 N.J. at 552.  We defer to the judge's evaluation of witness credibility, and to his expertise in family court matters.  Id. at 552-53; Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

Having reviewed the record in light of those legal standards, we find that Judge Ostrowski's factual findings are supported by substantial credible evidence, and he reached correct legal conclusions based on those findings. After reviewing the record with these standards in mind, we find no merit in any of defendant's arguments concerning the four prongs of the best interests test. We are satisfied that Judge Ostrowski's factual findings as to each prong are supported by substantial credible evidence in the record, and his thorough opinion amply addressed the issues.  R.G., 217 N.J. at 522.

We add these final comments. For months, the Division attempted to contact defendant, but he failed to respond or cooperate with the Division's efforts to schedule evaluations, and schedule weekly visits with Karen. The record reveals defendant has met Karen only once and he does not seek custody of her. Defendant simply has no relationship with Karen, who is now ten years old. Defendant's attempted surrender of his parental rights to his brother would only serve to undermine the Division's plan. Defendant dodged the Division for months and delayed providing his brother's contact information.

During the course of trial, Karen's half-siblings were removed from their original resource parent and placed with the maternal aunt. After the trial court entered its judgment, Karen's half-siblings were removed from the maternal aunt's home and returned to their previous resource home. Karen continues to remain with the maternal aunt.

Termination of parental rights may occur even if a child does not have a certain, permanent placement. When a termination action is based on parental unfitness rather than bonding, the proper inquiry under the fourth prong focuses on the child's need for permanency and the parent's inability to care for him or her in the foreseeable future. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (1996). Here, the child had at least two possible

placements. Termination did not cut off a permanent placement for this child. We see no reason to disturb the judge's rulings. The issue of whom will ultimately adopt Karen is a separate proceeding, unrelated to our determination that the record supports the judge's decision to terminate defendant's parental rights.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4523-18T2